IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL W. METZ, | ) | CASE NO.  1:24-CV-01671-SL |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Daniel W. Metz ("Plaintiff" or "Metz"), challenges the final decision of Defendant, Frank

Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 6, 2020, Metz filed an application for POD, DIB, alleging a disability onset date of May

1, 2018[2] and claiming he was disabled due to anxiety, depression, PTSD, ADHD, Restless Leg Syndrome,

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

[2] Metz subsequently amended the disability onset date to November 30, 2019.  (Transcript ("Tr.") 45.) The amended alleged onset date is the date after an Administrative Law Judge issued an unfavorable decision concerning Metz's prior application for POD, DIB, and SSI.  (*Id.*) Thus, the relevant period under

Borderline Personality Dependent Disorder, mood disorder, high blood pressure, irregular heart rate, and agoraphobia.  (Tr. 81.)  The applications were denied initially and upon reconsideration, and Metz requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 90, 99.)

On April 26, 2023, an ALJ held a hearing, during which Metz, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 40-63.)  On October 11, 2023, the ALJ issued a written decision finding Metz was not disabled.  (*Id*. at 17-39.)  The ALJ's decision became final on August 5, 2024, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On September 30, 2024, Metz filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9, 10.) Metz asserts the following assignments of error:

(1) The ALJ erred when she failed to support and/or address consistency with her conclusions regarding the opinions of the treating and reviewing sources.

(2) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(Doc. No. 7 at 1.)

## II.  EVIDENCE

### A.      Personal and Vocational Evidence

Metz was born in 1991 and was 32 years-old at the time of his administrative hearing (Tr. 32), making him a "younger" person under Social Security regulations.   *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has a high school education.  (Tr. 89, 32.)  He has past relevant work as a collections clerk.  (*Id*. at 32.)

---

consideration is November 30, 2019, the revised alleged on-set date, through June 30, 2021, the date last insured.

**B.     Relevant Medical Evidence[3]**

From September 30, 2018[4] to October 5, 2018, Metz was admitted to an inpatient psychiatric unit due to suicidal ideation. (*Id*. at 424-425.)

On March 23, 2019, Anthony Shumway, PMHNP-BC completed a "Mental Medical Source Statement." (*Id*. at 1299-1302.) Shumway cited extreme anxiety and worry, severe distractibility, poor focus, forgetfulness, severe agoraphobia, panic attacks, decreased self-esteem, insecurity, codependency, mood swings, irritability, and fear of leaving the house as clinical findings demonstrating the severity of Metz's mental impairment and symptoms. (*Id*. at 1299.) Shumway indicated Metz's current Global Assessment of Functioning ("GAF") score as 60 to 65, and his lowest GAF score of the past year as 60 to 65. (*Id*.) Shumway opined Metz was "unable to meet competitive standards" in the following areas:

- remember work-like procedures;
- maintain attention for two-hour segments;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions;
- complete a normal workday and workweek without interruptions from psychologically based symptoms;
- perform at a consistent pace without an reasonable number and length of rest periods;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- respond appropriately to changes in a routine work setting; deal with normal work stress;
- understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others;
- deal with stress of semiskilled and skilled work;
- interact appropriately with the general public;
- maintain socially appropriate behavior; and use public transportation

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[4] The parties cite to medical evidence dated 2018 and March 2019. (See Doc. No. 7 at pp. 2, 3-4, 14, 15; Doc. No. 9 at pp. 3-4.) These records pre-date Metz's alleged onset date and are thus of limited relevance. *Gore v. Comm'r of Soc. Sec..,* No. 5:20-CV-341, 2021 WL 3673196, at *4 (N.D. Ohio Aug. 19, 2021)(citing *Lorrison v. Berryhill*, No. 18-cv-10289, 2019 WL 1324247, at *6 (E.D. Mich. Mar. 25, 2019).

(*Id.* at 1300, 1301). Shumway opined Metz was "seriously limited, but not precluded" in the following areas:

- understand and remember very short and simple instructions;
- carry out very short and simple instructions;
- ask simple questions or request assistance;
- be aware of normal hazards and take appropriate precautions;
- adhere to basic standards of neatness and cleanliness

(*Id.*). Shumway opined Metz had "limited but satisfactory" ability to maintain regular attendance and be punctual within customary, usually strict tolerances. (*Id.* at 1300.) In support of his assessment, Shumway cited:

> Significant distractibility, severe distress, anxiety and panic attacks when out in public, decreased self-esteem/confidence, co-dependency on partner "John", mood swings, irritability, very forgetful, thought process circumstantial – tangential, second guesses himself, unable to effectively communicate or interact with customers or general public without significant distress, fear, or getting upset, extremely low frustration tolerance, fear of speaking up, unable to make phone calls or pay bills without assistance from life partner "John", inability to accept criticism without significant distress and worry.

(*Id.* at 1301.) He went on to cite poor focus and concentration, indecision, easily distracted and forgetful, fear of public, and easily overwhelmed and discouraged. (*Id.* at 1301.) Shumway thought Metz would have difficulty working at a regular job on a sustained basis due to history of confrontation with customers and supervisors during previous employment, history of morbid preoccupation and passive self-injurious behavior, and lack of insight as to how his symptoms and behaviors are perceived by others. (*Id.* at 1302.)

On November 23, 2019, Metz had a follow up appointment with Shumway. (*Id.* at 491.) Metz reported doing "horrible" and feeling more depressed following his disability hearing with a judge that did not go as he wished. (*Id.* at 492.) He reported feeling more depressed since the day of the hearing. (*Id.* at 492-3.)

On March 13, 2020, Metz had a follow up appointment with Shumway. (*Id.* at 504.) Metz reported his mood to be "pretty good" except for one Sunday when he felt a "random hopeless feeling, but that went

away." (*Id*. at 506.) He denied crying spells but was more irritable due to "Paxil withdrawal." (*Id*.) Metz stated Clonidine helped with restlessness and the ability to get more done around the house. (*Id*.) He denied thoughts of self-injury. (*Id*.) His diagnoses at this time included Major Depressive Disorder, Insomnia, Generalized Anxiety Disorder, Tachycardia, Attention-Deficit Hyperactivity Disorder ("ADHD"), Restless Leg Syndrome, Vitamin D Deficiency, Dependent Personality Disorder, Post-Traumatic Stress Disorder, Agoraphobia with Panic Disorder, and Borderline Personality Disorder. (*Id*. at 516.)

On July 11, 2020, Metz had a follow up appointment with Shumway. (*Id*. at 517.) Metz reported a scared and depressed mood due to current events. (*Id*. at 519.) He had not left his apartment in weeks except to get a pet groundhog squirrel. (*Id*.) He reported feeling less restless but still had some fidgetiness. (*Id*.) His focus and attention were "ok" but sometimes he gets "stuck" on something. (*Id*.) Metz reported painting and found it therapeutic to get his feelings out on canvas. (*Id*.)

On November 17, 2020, Metz had a follow up appointment with Shumway. (*Id*. at 547.) Metz reported his depression at four out of ten and his anxiety at a four out of ten. (*Id*. at 548-49.) He denied angry outbursts. (*Id*. at 549.) He reported one nightmare and no flashbacks. (*Id*.)

On December 18, 2020, Metz had a follow up appointment with Shumway. (*Id*. at 578.) Metz reported being "miserable" because he caught his fiancé talking to other men and the death of a friend. (*Id*. at 579.) He reported crying spells and avoiding his fiancé. (*Id*.) He reported elevated anxiety, with panic attacks nearly every day, due to current stressors. (*Id*. at 580.) Metz stated he was afraid to leave the house due to COVID-19. (*Id*.)

On February 13, 2021, Metz had a follow up appointment with Shumway. (*Id*. at 597.) Metz reported doing well and rated his current level of depression to be zero out of ten. (*Id*. at 598-9.) He stated at its worst, his depression is a four out of ten. (*Id*. at 599.) He reported crying spells and feeling hopelessness "once in a while." (*Id*.) Metz reported displaying his artwork on TikTok and doing meditations through

5

"The Monroe Institute." (*Id*. at 598.) He stated he enjoys "painting, artwork, making paper weights, making ouji boards, [and was] considering selling some of his artwork, products on Etsy." (*Id*.) Metz reported his anxiety was "all over the place" but denied panic attacks since his last appointment. (*Id*.) A mental status examination revealed euthymic affect, "calm, laughing, smiling frequently . . ." (*Id*. at 603.) He had good eye contact, clear speech, and normal memory. (*Id*.) He had fair insight, judgment, and concentration. (*Id*. at 603-604.) His anxiety was "mild-none". (*Id*. at 604.)

On March 9, 2021, Metz had a follow up appointment with Shumway. (*Id*. at 620.) Metz reported doing ok overall. (*Id*. at 621.) His medications remained "efficacious". (*Id*.) He reported feeling "a bit more restless" after running out of a medication, but otherwise denied side effects of his medications. (*Id*.) He reported "some" depression and manageable anxiety, reporting one panic attack per week. (*Id*. at 622.) He reported having an "angry outburst" about once per week. (*Id*.) He denied nightmares, flashbacks, and obsessive-compulsive disorder symptoms. (*Id*.)

On April 10, 2021, Metz had a follow up appointment with Shumway. (*Id*. at 644.) Metz reported "doing good overall" and his medications remain "efficacious". (*Id*. at 645.) He reported some depressed feelings and some anxiety around communications with his mother. (*Id*. at 645-46.) A mental status examination revealed full affect, euthymic mood, normal memory, fair attention, and fair insight and judgment. (*Id*. at 649.)

On May 11, 2021, Metz had a follow up appointment with Shumway. (*Id*. at 766.) Metz reported doing "good" overall. (*Id*. at 767.) He denied depression and reported his anxiety at a four out of ten. (*Id*. at 768.) He denied mood swings and reported one angry outburst. (*Id*. at 768.) He reported finishing a painting in two days as "proof positive that he is able to focus [and] stay on task." (*Id*. at 769.) A mental status examination revealed his mood and affect was euthymic, his eye contact was good, his speech was clear and conversational, his memory was normal, and his attention was fair. (*Id*. at 773.)

On June 5, 2021, Metz had a follow up appointment with Shumway. (*Id.* at 791.) Metz reported "doing good" and "living the dream!" (*Id.* at 792.) He stated his medication remained efficacious and denied side effects. (*Id.*) He denied depression except for walking up some mornings feeling depressed for only "a minute." (*Id.* at 793.) He denied crying spells and denied feelings of hopelessness. (*Id.*) He reported one panic attack since his last appointment, when he visited a Walmart store and "felt uncomfortable but was able to remain in the store for the entire planned duration." (*Id.*) He reported a goal of starting to sell his artwork. (*Id.*) He reported some irritability and denied angry outbursts. (*Id.*) He reported that his focus and attention has been "pretty good." (*Id.* at 794.) A mental status examination revealed euthymic affect, congruent mood, good eye contact, clear speech, normal memory, good attention and concentration, fair insight, and good judgment. (*Id.* at 797-98.)

On July 24, 2021, Metz had a follow up appointment with Shumway. (*Id.* at 817.) Metz reported doing "ok." (*Id.* at 819.) He stated that his medications were effective, he visited Cedar Point and had a lot of fun, and planned to visit his aunt in Florida. (*Id.*) He denied depression and reported only "a couple" crying spells. (*Id.* at 819.) He stated he is "now doing digital artwork." (*Id.*) He reported a couple of panic attacks but "they are not as bad as they used to be." (*Id.*) He reported his attention was "pretty good" while on medication. (*Id.* at 820.)

## C. State Agency Reports

### 1. Mental Impairments

On January 8, 2021, Cindy Matyi, Ph.D., reviewed the file and opined Metz could comprehend, remember, and carry out simple, one-to-two step instructions and occasionally complex and detailed, three-to-four step instructions. (*Id.* at 87-88.) Dr. Matyi determined Metz could maintain attention, make simple decisions, and adhere to a schedule. (*Id* .at 88.) She noted Metz would need a relatively isolated workstation and supervisory support when first learning job tasks. (*Id.*) She noted Metz was susceptible to

misinterpreting interpersonal nuance but could relate adequately on a superficial basis in an environment that entails minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny. (*Id*.) Dr. Matyi added Metz should not be expected to deal with the public. (*Id*.) Dr. Matyi opined that perceived stressors would exacerbate Metz's symptoms. (*Id*.) She asserted Metz could adapt to a setting where duties are routine and predictable, with infrequent changes that are explained in advance and introduced slowly. (*Id*.) She added that Metz would require supervisory support with goal-setting and planning. (*Id*.)

On April 30, 2021, on reconsideration, Courtney Zeune, Psy.D., affirmed Dr. Matyi's findings. (*Id*. at 95.)

### D.    Hearing Testimony

During the April 26, 2023 hearing, Metz testified to the following: [5]

• Metz previously worked as a cashier for Mark Glassman Company. (*Id*. at 47.) He previously worked as a collections clerk for National Enterprise Systems. (*Id*. at 48.) At this job he collected on small student loan balances. (*Id*.) He would go into the office and work at a desk calling people. (*Id*.) He left the job because it was stressful and caused him stomach issues. (*Id*. at 48-49.) It was stressful because there was a lot going on and employees would be yelled at if they didn't hit their goal. (*Id*. at 49.) He has not worked anywhere since 2018. (*Id*. at 56.)

• He cannot work because he has a lot of mood problems and doesn't take authority well. (*Id*. at 49.) He is afraid to leave his house and gets very defensive when he is outside of his "own little bubble". (*Id*.) He has a hard time following instructions. (*Id*.) His "bubble" involves being in his basement with his animals. (*Id*. at 50.) He does not hang out with people. (*Id*.) He lives with his caretaker, a close family friend. (*Id*.) Metz later clarified that this person is his fiancé. (*Id*. at 51.) His fiancé is trained to deal with mental health problems. (*Id*. at 50.) Metz lives in his fiancé's house. (*Id*. at 51.) He has negative interactions with his fiancé about once per week, and it is usually brought on by a normal everyday circumstance. (*Id*. at 51-52.)

• Metz has not left his house in the past four months. (*Id*. at 52.) He almost never leaves the house. (*Id*.) The last time he left the house was on Christmas to go to his fiancé's family's house. (*Id*.) He has doctor appointments over the phone and his fiancé picks up his medications. (*Id*.) His fiancé does the grocery shopping. (*Id*. at 53.) On Thanksgiving he

---

[5] After the hearing, Metz became the subject of investigation by the Cleveland, Ohio Cooperative Disability Investigations Unit because of fraud that was referred from within the Office of Hearing Operations. A Summary Report of Investigation was completed on August 14, 2023. (*Id*. at 1308-79.)

went to his fiancé's mom's house where five people were present. (*Id*.) He sat with everyone for about forty-five minutes before he excused himself to go downstairs and watch TV. (*Id*.)

• Metz would have anxiety if he had a job with coworkers and a boss. (*Id*. at 53-54.) When he has anxiety it feels like a tornado in his chest and he goes into his imaginary world. (*Id*. at 54.) He struggles to pay attention when this happens. (*Id*.)

• In the past three years, since his last ALJ hearing, he has gotten worse because he fears germs due to Covid and he has a harder time trusting information. (*Id*. at 55.) He has morbid thoughts that sometimes lead to him being in the hospital for periods of time. (*Id*.) He was hospitalized in 2018 in Columbus. (*Id*. at 56.) He does not see the same therapist as he did in 2019 because she's "a little bit of an antivaxxer, and that just freaks [him] out" but the rest of his care team he sees regularly. (*Id.* at 55.)

Metz had past work as a collections clerk.  (*Id*. at 47.)  The ALJ posed the following hypothetical question to the VE:

> [A]ssume an individual who can perform work at tasks that are routine in nature, that are in a low-stress environment defined as no fast-paced, strict quotas, or frequent duty changes. Also, this job would not involve -- would involve only superficial interpersonal interactions with coworkers and supervisors defined as no arbitration, negotiation or confrontation, and no interaction with the general public as a job requirement. As you review this hypothetical individual, can you tell me whether or not this individual could return to the claimant's past work?

(*Id*. at 56-57.)

The VE testified the hypothetical individual would not be able to perform Metz's past work as collections clerk.  (*Id*. at 47.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as hospital cleaner, laundry worker, and laundry laborer. (*Id*. at 57.) Metz's attorney asked about any limitation in terms of the quantity of interaction that the hypothetical individual could have with coworkers and supervisors. (*Id*. at 58.) The VE explained he assumed superficial interactions with coworkers and supervisors, up to occasional interactions, no more than that. (*Id*.) The ALJ then asked a second hypothetical:

> [T]his individual can perform a full range of work at all exertional levels, but with the following nonexertional limitations. This individual can engage in work tasks that are routine in nature, meaning up to occasional changes

> can be performed. I should say up to occasional changes in work duties. Can work in a low-stress environment defined as no fast-paced strict quotas or frequent duty changes. I guess that is synonymous with what I had said earlier, saying -- meaning up to occasional changes in work duties. Okay. And let me go back to fast-paced with frequent duty changes. Can interact with coworkers, supervisors up to occasionally -- hold on -- for work related purposes that do not involve arbitration, negotiation or confrontation, and no interaction -- hold one second -- and no interaction with the general public as a job requirement. So I might as well put in here incidental interactions are acceptable. For example, let's say he's a dishwasher. The job duties do not require him to interact with the general public. However, if the supervisor or the manager says hey, go out there and get all the dirty dishes from the stand, in doing so the dishwasher may encounter a patron. And at that point, that would be an -- that would be an example of an acceptable -- what I would characterize as an incidental interaction with the public. . . . Now, as you review this hypothetical individual, can you identify any work for such a person?

(*Id*. at 59-60.) The VE responded, "[b]ased on the hypothetical, the same three jobs that were offered for hypothetical one would remain in the same numbers." (*Id*. at 60.)

Metz's attorney asked if the individual were to require an isolated workstation, whether that person would be able to perform competitive employment and the VE testified that would be work preclusive. (*Id*.) Metz's attorney asked whether an individual that would be off task 20 percent or greater of a workday due to medical impairments, whether that would impact their ability to maintain and retain employment. (*Id*. at 60-61.) The VE testified that it would be work preclusive. (*Id*. at 61.) Metz's attorney asked whether someone who is absent four days per month due to their impairments, if that would impact their ability to maintain employment. (*Id*.) The VE testified that amount of absence would be work preclusive. (*Id*.) Metz's attorney asked, "[i]f a hypothetical individual were to require additional supervision for redirection and retraining of tasks even after the initial training period – let's say twice per day but on an ongoing basis. Would that impact their ability to perform competitive employment?" (*Id*.) The VE responded, "[b]ased on my experience, the types of work that were described as part of my testimony in unskilled work, wouldn't

10

require such redirection. So based on the hypothetical, an individual that would require that amount of official supervisory interaction or redirection would be work preclusive." (*Id*.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not

11

prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Metz was insured on the alleged disability onset date, November 30, 2019, and remains insured through June 30, 2021, the date last insured ("DLI").  (Tr. 20, 81.) Therefore, in order to be entitled to POD and DIB, Metz must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2021.

2. The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of November 30, 2019 through his date last insured of June 30, 2021 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: major depressive disorder, generalized anxiety disorder, agoraphobia with panic disorder, posttraumatic stress disorder (PTSD), dependent personality disorder, borderline personality disorder, and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: can engage in work tasks that are routine in nature, meaning up to occasional changes in work duties; can work in a low stress environment, defined as no fast pace, strict quotas, or frequent duty changes; can interact with coworkers supervisors up to

occasionally for work related purposes that do not involve arbitration, negotiation, or confrontation; and no interaction with the general public as a job requirement, though incidental interactions are acceptable.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on January 14, 1991 and was 30 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 30, 2019, the amended alleged onset date, through June 30, 2021, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-34.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human*

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No.

14

11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## A.    Opinion Evidence

In his first assignment of error, Metz argues the ALJ finding Shumway's opinion unpersuasive is "incorrect" based on "the supporting records." (Doc. No. 7 at 10.) Metz asserts the "actual opinion along with the extensive treatment notes established that the ALJ failed to support her erroneous conclusion as the medical opinion was consistent with the medical evidence in the record." (*Id*. at 11.) Metz argues the ALJ provided no analysis regarding the consistency of Shumway's opinion with the other evidence. (*Id*.)

Metz also argues the ALJ incorrectly found the opinions of the state agency medical consultants not persuasive. (*Id*.) Metz states the ALJ "erroneously substitute[d] her own judgment in this matter." (*Id*. at 12.) Metz asserts the ALJ's failure to find the "opinions of the treating and reviewing sources persuasive was in error as the rationale was contrary to the evidence set forth above." (*Id*.) Metz concluded that the ALJ's determination was not supported by substantial evidence. (*Id*. at 13.)

In response, the Commissioner argues the ALJ sufficiently articulated the supportability factor when she found Shumway's opinions were unsupported by his own explanations and his own treatment records. (Doc. No 9 at 10-14.) The ALJ cited Shumway's GAF scores and mental status examinations that were "unsupportive of the extreme limitations set out in the March 2019 statement". (*Id*. at 10-11.) The Commissioner states Metz points to subjective complaints and various diagnoses to support his statement that the ALJ's opinion is "incorrect", but this ignores the substantial evidence standard. (*Id*. at 12.) The Commissioner asserts the ALJ addressed consistency when she addressed other evidence of record,

15

including Metz's activities. (*Id.* at 12-13.) The Commissioner contends the ALJ set forth a "thorough description of the evidence" in the remainder of the decision, which supports her conclusions as to Shumway's opinions. (*Id.* at 13.)

The Commissioner asserts Metz's argument that the ALJ substituted her own opinion for that of a "medical opinion" fails as a matter of law because an ALJ is not required to formulate an RFC based on a physician's opinion, but rather, must determine an RFC based on her evaluation of both medical and non-medical evidence. (*Id.* at 14-15.) The Commissioner argues Metz's citing this ALJ's statements in another case is improper and has no bearing on whether substantial evidence supports the ALJ's findings in this case. (*Id.* at 15.)

In his reply brief, Metz reiterates the same arguments set forth in his Brief on the Merits. (Doc. No. 10, at 1-4.)

Since Metz's claim was filed after March 17, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the

16

factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the

---

[6] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[7] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

17

supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the opinion of Metz's mental health provider, Anthony Shumway, CNP, as follows:

The claimant's mental health provider, Anthony Shumway, CNP, opined on March 23, 2019 that the claimant is unable to meet competitive standards with regard to his ability to remember work-like procedures, maintain attention for two hour segments, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond

18

appropriately to changes in a routine work setting, deal with normal work stress, understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with the stress of semiskilled and skilled work, interact appropriately with the general public, maintain socially appropriate behavior, and use public transportation (Exhibit B13F). Mr. Shumway opined the claimant is seriously limited, but not precluded in terms of his ability to understand and remember very short and simple instructions, carry out very short and simple instructions, adhere to basic standards of neatness and cleanliness, and travel in an unfamiliar place (*Id*.). Mr. Shumway noted the claimant experiences limited but satisfactory ability to maintain regular attendance and be punctual within customary, usually strict tolerances (*Id*.). Mr. Shumway opined the claimant would be absent a minimum of 4 to 5 days per month, and off task greater than 50% of the time (*Id*.). This opinion, rendered by way of a checklist, and completed months before the amended alleged onset date, is not persuasive for several reasons. First, the opinion is inadequately supported. Mr. Shumway noted significant distractibility, severe anxiety and panic attacks in public, mood swings, irritability, decreased self-esteem, codependency, circumstantial thought processes, low frustration tolerance, poor communication, inability to accept criticism, poor focus and concentration, indecisiveness, and agoraphobia, with only fair response to medication and psychotherapy (*Id*.). However, Mr. Shumway did not note significant objective abnormalities on mental status examination, such as impaired orientation, abnormal psychomotor activity, impaired hygiene or appearance, decreased eye contact, an abnormal mood and affect, decreased attention, concentration, or memory, or abnormal thought processes or thought content, to support the extreme limitations contained therein (*Id*.). Additionally, the opinion is inadequately supported by, and in fact inconsistent with, the global assessment of functioning (GAF) score range of 60 to 65 contained therein, which indicates moderate to mild symptoms, difficulties, or impairment (Exhibit B13F/1). The opinion is also inadequately supported by Mr. Shumway's own treatment notes, which contain findings of baseline fidgeting, only fair hygiene/grooming, with occasionally disheveled hair, a very slightly anxious affect, occasionally limited to fair attention/concentration, and decreased insight and judgment, but normal alertness and orientation, open, calm, cooperative behavior, good eye contact, a generally euthymic mood, generally congruent affect, with no lability, normal speech, memory, thoughts, and perceptions, and good attention/concentration at times, and which confirm good to very good progress with limited, conservative behavioral health treatment (Exhibit B2F; B3F/67-126; B4F/15-101; B6F; B7F; B9F; B10F; B12F). Furthermore, Mr. Shumway's extremely restrictive opinion is inconsistent with the remaining evidence of record, namely the claimant's extensive reported activities, which including caring for pets, painting, reading books, shopping in stores, albeit with some difficulty, travelling out of state via plane, going to the amusement park

Cedar Point, using social media and the internet, playing video games, going out to eat with his fiancé and friends, house hunting, and attend family holiday gatherings (Exhibit B3F, B6F, B7F, B10F). For these reasons, the undersigned finds Mr. Shumway's opinion unpersuasive.

(Tr. 30-31.)

The ALJ analyzed the prior administrative medical findings as follows:

The prior administrative medical findings pertaining to mental impairment are not persuasive.

State disability determination services psychological consultants Cindy Matyi, Ph.D., and Courtney Zeune, Psy.D., opined on January 8, 2021 and April 30, 2021 respectively that the claimant's condition restricts his capacity for detailed/complex tasks, but he is able to comprehend and remember simple (1-2 step) and occasional complex/detailed (3-4 step) instructions (Exhibit B2A, B4A). Dr. Matyi and Dr. Zeune opined the claimant can carry out simple (1-2 step) and occasional complex/detailed (3-4 step) tasks, maintain attention, make simple decisions, and adequately adhere to a schedule (*Id.*). They noted the claimant would need a relatively isolated workstation and supervisory support when first learning job tasks (*Id.*). Dr. Matyi and Dr. Zeune noted the claimant is susceptible to misinterpreting interpersonal nuance, yet can relate adequately on a superficial basis in an environment that entails minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny (*Id.*). They opined the claimant should not be expected to deal with the public (*Id.*). Dr. Matyi and Dr. Zeune noted the claimant's symptoms would exacerbate in the face of perceived stressors, yet he can adapt to a setting in which duties are routine and predictable and in which changes are infrequent, explained in advance, and introduced slowly (*Id.*). They opined the claimant would require supervisory support with goal-setting and planning (*Id.*). These opinions, which employ vague, imprecise language, with vocationally inappropriate terminology, are not persuasive for several reasons, and the undersigned did not use or adopt any of such verbiage. First, the opinions are inadequately supported, as they did not take into consideration the most recent mental health treatment (*see* Exhibit B7F, B9F, B10F, B12F), and appear to be based largely upon the claimant's subjectively reported mood symptoms, such as anxiety, depression, crying spells, mood swings, suicidal ideation, and difficulty leaving the house (Exhibit B2A/3-4, 8; B4A/2, 7).

In fact, the opinions are absent discussion of significant objective abnormalities to support the limitations contained therein, such as the need to work in isolation, noting a mildly dysthymic presentation, but calm behavior, with laughing and frequent smiling on examinations noted therein (*Id.*). Additionally, the opinions are somewhat internally inconsistent,

20

noting the claimant cannot tolerate over the shoulder supervisory scrutiny, but also requires additional supervisory support (Exhibit B2A, B4A). Furthermore, the opinions are inconsistent with the remaining evidence of record, including subsequent mental health treatment notes, which indicate persistent mood symptoms, but confirm normal alertness and orientation, cooperative behavior, a generally euthymic, full range mood, a generally bright, appropriate affect, with no lability, good eye contact, and normal speech, memory, thoughts, and perceptions on mental status examinations (Exhibit B7F, B9F, B10F, B12F). Additionally, the opinions are inconsistent with the claimant's extensive reported activities, which including caring for pets, painting, reading books, shopping in stores, albeit with some difficulty, travelling out of state via plane, going to the amusement park Cedar Point, using social media and the internet, playing video games, going out to eat with his fiancé and friends, house hunting, and attend family holiday gatherings (Exhibit B3F, B6F, B7F, B10F). For these reasons, the undersigned finds the opinions of Dr. Matyi and Dr. Zeune unpersuasive.

(*Id*. at 29-30.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). The ALJ considered the supportability and consistency of Shumway's opinions, discussing how his opinion was both not well supported and inconsistent with his own treatment records. (Tr. 30-31.) The ALJ noted the opinion itself was inadequately supported where Shumway noted significant mental defects, yet Shumway "did not note significant objective abnormalities on mental status examination". (*Id*. at 30.) The ALJ further explained the opinion was "inadequately support by, and in fact inconsistent with, the global assessment of functioning (GAF) score range of 60-65 . . . which indicates moderate to mild symptoms". (*Id*. at 31.) The ALJ described how the opinion was inadequately supported by Shumway's own treatment notes, which contain findings of fidgeting, slight anxiety, fair attention and concentration, euthymic mood, among other findings supporting good progress with conservative behavioral health treatment. (*Id*. at 31.) Finally, ALJ addressed that Shumway's "extremely restrictive opinion" is inconsistent with Metz's "extensive reported activities" which included caring for pets, painting, reading books, shopping (with some difficulty), traveling via

21

airplane, going to amusement parks, and attending family holiday gatherings, among other activities. (*Id*.) The ALJ found Shumway's opinion unpersuasive because it was inadequately supported on its face, it was inconsistent with the GAF score, it was unsupported by Shumway's own treatment records, and it was inconsistent with the remaining evidence of record, including Metz's reported activities. (*Id*. at 30-31.)

The ALJ considered the supportability and consistency of the prior administrative medical findings, discussing how the opinions are inadequately supported, internally inconsistent, inconsistent with the remaining evidence of record, and inconsistent with Metz's reported activities. (*Id*. at 29-30.) The ALJ explained the opinions did not consider the most recent mental health treatment (*see* Tr. 843-897, 992-1298), "appear based upon the claimant's subjectively reported mood symptoms", and "are absent discussion of significant objective abnormalities to support the limitations contained therein . . ." (*Id*. at 29-30.) The ALJ noted the opinions are somewhat internally inconsistent because they opine Metz cannot tolerate over the shoulder supervision, but also requires additional supervisor support. (*Id*. at 30.) The ALJ described how the opinions are inconsistent with the remaining evidence of record, including mental health records noting cooperative behavior, euthymic mood, good eye contact, among other normal findings. (*Id*.) Finally, the ALJ noted the opinions are inconsistent with Metz's extensive reported activities, including but not limited to caring for pets, painting, shopping, travelling, visiting amusement parks, playing video games, and attending family holiday gatherings. (*Id*.)

Metz argues the ALJ "substituted her own judgment" for that of the state agency medical consultants because she found their opinions unpersuasive. (Doc. No. 7 at 12.) However, "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence . . . . to require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability . . ." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013), citing SSR 96–5p, 1996

WL 374183 (July 2, 1996); *see also Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work").

The ALJ is not required to base her RFC on the opinion of a physician. Metz cites *McQuin v. Comm'r of Soc. Sec.*, No. 3:12-CV-1704, 2014 WL 1369674, at *15 (N.D. Ohio Mar. 31, 2014) for the proposition that remand is required where "no medical opinions supported the ALJ's determination." (Doc. No. 7 at 12.) In *McQuin*, the Court found that the ALJ imposed functional limitations after not accepting the opinion offered by the only medical professional and "without any other medical opinion supporting her conclusion."  2014 WL 1369674, at *14. Here, the ALJ did not impose an RFC finding contrary to the opinion of a medical source, rather, the ALJ included citations to evidence supporting the RFC finding, including a discussion of Metz's objective medical evidence, mental health treatment notes, mental status examinations, medication side effects and lack thereof, activities of daily living, GAF scores, and the scope of his treatment. (Tr. 24-28.) The ALJ did not make the RFC finding without providing reasons for the finding, but instead relied on the evidence of record. Moreover, the Sixth Circuit has rejected the argument that an ALJ's RFC cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Lutizio v. Comm'r of Soc. Sec.*, No. 1:23-cv-01675, 2024 WL 3429479, at *14 (N.D. Ohio July 16, 2024) citing *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F.App'x 395, 401 (6th Cir. 2018).

Substantial evidence supports the ALJ's determination.  *Rogers*, 486 F.3d at 241.  It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Metz would weigh the evidence differently, it is not for the Court to do so on appeal. See *Her*, 203 F.3d at 389-90.

There is no error.

23

## B. Symptom Evaluation

In his second assignment of error, Metz argues the ALJ failed to properly evaluate Metz's symptoms pursuant to SSR 16-3p. (Doc. No. 7 at 13-19.) Metz asserts his testimony concerning his symptoms is consistent with the medical evidence. (*Id*. at 13-16.) Metz claims the ALJ erred by considering Metz's activities inconsistent with the medical evidence, asserting that the ability to perform some activities is not enough to render a finding that Metz could perform full time work. (*Id*. at 16-17.) Metz states that evidence of his impairments was corroborated by his testimony, rendering the ALJ's opinion unsupported by substantial evidence. (*Id*. at 17.) Metz argues the ALJ failed to articulate her rationale for finding Metz's statements not entirely consistent with the medical evidence, thus requiring remand. (*Id*.)

In response, the Commissioner argues the ALJ properly evaluated Metz's allegations by applying several factors of SSR 16-3p and concluding that the level of mental impairments alleged was not entirely consistent with the record evidence. (Doc. No 9 at 17.) The Commissioner notes the ALJ considered objective medical evidence, including evidence that tended to support Metz's allegations as well as evidence that detracted from them. (*Id*.) The Commissioner argues the ALJ considered Metz's various activities as inconsistent with his claims of total disability. (*Id*. at 18.) The Commissioner states the ALJ discussed Metz's treatment, including medication efficacy. (*Id*. at 19.) The Commissioner argues the ALJ properly considered several of the SSR 16-3p factors, and Metz's argument is an improper request to reweigh the evidence. (*Id*. at 20.)

In his reply brief, Metz did not address his second assignment of error. (Doc. No. 10 at 1-4.)

A two-step process is used to evaluate an individual's symptoms. (20 CFR § 404.1529(c)(3), 416.929(c)(3); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304.) At step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's

alleged symptoms. (*Id*.; SSR 16-3p, 2017 WL 5180304 at *3.) At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. (*Id*. at *4.) "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . [an ALJ] must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." (*Id*. at *5.)

An ALJ may consider the following factors when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

(*Id*. at *7-8.) An ALJ is not required to analyze all seven factors. *Pettigrew v. Berryhill*, No. 1:17-CV-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted,* No. 1:17CV1118, 2018 WL 3093696 (N.D. Ohio June 22, 2018), citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

In evaluating complaints of pain or other symptoms, an ALJ may properly consider the credibility of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), citing *Kirk v. Secretary of Health and Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's

25

demeanor and credibility." *Id.*, citing *Villarreal v. Secretary of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* citing *Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386–87 (6th Cir.1978).

"An ALJ's determination of subjective evidence receives great deference on review." *Jones v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01257-DAC, 2022 WL 3155823, at *16 (N.D. Ohio Aug. 8, 2022), citing *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). "Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them." *Id.*, citing *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ analyzed Metz's symptoms, devoting nearly five single spaced pages to her analysis. (Tr. 24-28.) The ALJ wrote, in part:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record dated prior to the date last insured for the reasons explained in this decision.
>
> The objective medical evidence does not fully corroborate the claimant's allegations.

(*Id.* at 24.) The ALJ went on to detail medical evidence, including mental health treatment notes dated prior to the alleged onset date confirming a history of depression and ADHD treated with medications, Metz's 2018 hospitalization for suicidal ideation, and a 2020 hospital visit for neck pain likely due to "his work as a painter". (*Id.* at 24-25.) The ALJ extensively discussed his outpatient mental health treatment with Shumway, including treatment notes containing reports of moodiness, anxiety, agoraphobia, depression,

26

crying spells, and sleep problems, among other details. (*Id*. at 25.) The ALJ noted Shumway's treatment notes indicated extensive activities of daily living, including care for a pet, completing a three-foot by four-foot painting of the Cleveland skyline, reports that Metz continued to paint regularly, and Metz indicating he was afraid to leave his house in December 2020 due to fears of COVID-19. (*Id*.) The ALJ acknowledged Metz reported reading books, being better organized, finishing a painting in two days, and having a goal of selling his artwork. (*Id*.) The ALJ recognized Metz's ability to shop in a store but with some difficulty, travel out of state to visit family, go to Cedar Point amusement park, spend time on social media, and play video games. (*Id*.) The ALJ noted Metz was able to go out to dinner with his fiancé and friends and attend family holiday parties. (*Id*.)

The ALJ extensively discussed mental status examinations, including symptoms, diagnoses, medication efficacy, and Metz's progress. (*Id*. at 26.) She noted, in part:

> As shown above, through the date last insured, the claimant experienced symptoms associated with major depressive disorder, generalized anxiety disorder, agoraphobia with panic disorder, posttraumatic stress disorder (PTSD), dependent personality disorder, borderline personality disorder, and attention deficit hyperactivity disorder that would have reasonably interfered with his ability to perform complex tasks, interact with others, work at a rapid pace, and tolerate a stressful work environment (Exhibit B1F, B2F, B3F, B4F, B5F, B6F, B7F, B8F, B9F, B10F, B12F). Although the claimant was alert, oriented, and able to maintain sufficient concentration to participate in mental status examinations conducted prior to the date last insured, he was mildly anxious, with baseline fidgeting, fair hygiene and grooming, with occasionally disheveled hair, a depressed, anxious mood, a restricted and/or anxious affect, occasionally limited/fair attention/concentration, and decreased insight and judgment (*Id*.).

(*Id*. at 26.) The ALJ noted the GAF score, indicating mild to moderate symptoms, and acknowledged GAF scores are not determinative of overall disability. (*Id*. at 27.) The ALJ further stated:

> In addition to the objective medical evidence, the undersigned has also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of his severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment. However, these factors do

27

> not show that the claimant was more limited prior to the date last insured
> than determined when setting forth the above residual functional capacity.

(*Id*. at 27.) The ALJ went on to discuss Metz's extensive activities of daily living, which were found to detract from his allegations, and support the ALJ's residual functional capacity. (*Id*.) The ALJ considered Metz's scope of treatment, writing:

> In assessing the claimant's allegations, the undersigned has also considered
> the scope of treatment. The claimant's mental impairments are treated
> conservatively, with medications and psychotherapy administered by
> mental health provider Anthony Shumway, PMHNP-BC (Exhibit B2F,
> B3F, B4F, B6F, B7F, B9F, B10F, B12F). The claimant has remained
> symptomatic, thereby confirming the need for continued mental health
> treatment and medication adjustments (*Id*.). However, the claimant has
> consistently reported medication efficacy (*see* Exhibit B4F/16; B6F/3), and
> the behavioral health record confirms good to very good progress with
> conservative behavioral health treatment (Exhibit B2F; B3F/67-126;
> B4F/15-101; B6F; B7F; B9F; B10F; B12F). The claimant has not sought
> more extensive mental health treatment, such as participation in case
> management services, an intensive outpatient program, or partial
> hospitalization program, and the claimant has not required emergency
> hospitalization or inpatient psychiatric treatment since the amended alleged
> onset date (Exhibit B1F, B2F, B3F, B4F, B5F, B6F, B7F, B8F, B9F, B10F,
> B11F, B12F). In fact, mental status examinations have revealed generally
> mild to moderate psychiatric abnormalities at most (*Id*.). This confirms the
> claimant's mental impairments, while severe, were adequately controlled
> with limited, conservative outpatient behavioral health treatment prior to the
> date last insured.
>
> The claimant has alleged numerous complaints in support of his application
> for disability, and the record does support some limitations due to his
> symptoms and allegations. However, when considering the claimant's
> testimony in light of the limited, conservative treatment record and the
> mainly mild to moderate examination findings prior to the date last insured,
> the claimant's impairments were not as debilitating as he has alleged. The
> allegations of disability made by the claimant are therefore not entirely
> consistent with the evidence.

(*Id*. at 28.)

The ALJ properly followed the two-step process for evaluating Metz's symptoms. At step-one, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause

the alleged symptoms . . ." (*Id.* at 24.) The ALJ ultimately found the "claimant's statement's concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the objective evidence of record and other evidence in the record dated prior to the date last insured . . ." (*Id.*) The ALJ considered the objective medical evidence, including diagnoses, examination results, medication effectiveness and lack of adverse side effects. (*Id.* at 24-27.) Moreover, the ALJ discussed several of the seven factors set forth in SSR 16–3p for finding Metz's impairments not as debilitating as he alleged. (*Id.*) She considered Metz's testimony, activities of daily living, the location, duration, frequency, and intensity of his symptoms, medication side effects or lack thereof, and scope of treatment. (*Id.*)

An ALJ must follow the two-step process for evaluating a claimant's symptoms and as part of that evaluation, an ALJ must consider whether the symptoms are consistent with the objective medical evidence and she did so here. SSR 16-3p, 2017 WL 5180304 at *5. Substantial evidence supports the ALJ's decision. See *Rogers,* 486 F.3d at 241. Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's symptom analysis was insufficient.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: July 22, 2025                              s/ *Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**